## LOUISVILLE & N. R. CO. v. SUMMERLIN.

Circuit Court of Appeals, Fifth Circuit.
April 19, 1927.

No. 4981.

Master and servant ☞286(33)—Negligence of railroad company, causing death of switchman, held question for jury.

Plaintiff's intestate, member of a switching crew of defendant railroad, in course of duty mounted one of a cut of five cars kicked on a switch track, for the purpose of setting the hand brakes, to do which he was obliged to stand on a small platform at the end of the cars, which were gondolas. Five or six minutes later an engine backed two more cars on the track at an admittedly dangerous speed, striking the first cars and shoving them. The body of the switchman was found under the cars, about the center of the cut as it stood. *Held*, that the facts, with inferences to be drawn therefrom, were sufficient to take the question of defendant's negligence, causing the death, to the jury.

In Error to the District Court of the United States for the Northern District of Florida; William B. Sheppard, Judge.

Action at law by Ellen A. Summerlin, as administratrix of the Estate of Eugene H. Summerlin, deceased, against the Louisville & Nashville Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Francis B. Carter, of Pensacola, Fla. (Carter & Yonge, of Pensacola, Fla., on the brief), for plaintiff in error.

Philip D. Beall and John M. Coe, both of Pensacola, Fla., for defendant in error.

Before WALKER, BRYAN, and FOSTER, Circuit Judges.

FOSTER, Circuit Judge. Defendant in error, hereafter called plaintiff, brought suit against the plaintiff in error, hereafter called defendant, to recover damages for the death of her husband. At the close of the evidence defendant moved for a directed verdict, which was denied, and the case was submitted to the jury, with the result that a

verdict was returned in favor of plaintiff for $5,000, on which judgment was entered, and to reverse which this writ of error has been sued out.

The only error assigned is to the denial of the motion to direct a verdict. There is evidence in the record tending to support the following state of facts:

Summerlin was an interstate employee of defendant, a member of the switching crew in the yard of Pensacola, Fla. It was his duty to line switches, and then set the hand brakes on the cars put in on certain tracks in making up trains. On the night of his death, November 17, 1925, he threw the switch on what was designated as No. 5 track. A cut of five cars was kicked in on this track, and he caught the first car and rode it for the purpose of setting the brakes. Within five or six minutes two more cars were backed in on track No. 5 by the engine and coupled by impact with the cars already there. These two cars were not kicked, but were shoved in at the rate of six miles an hour, and the whole string moved after coupling. The safety committee of the yard, at a meeting attended by the engineer who was in charge of the switching engine on the night of Summerlin's death, had previously decided that over three miles an hour was an unsafe speed for switching at this particular point. Other testimony in the record fixes safe speed at two miles per hour.

These seven cars were coal cars of the gondola and hopper type, and were so constructed that brakemen did not walk over them. In setting the brakes on this type of car, a man has to stand on the platform at the end, 8 inches wide by 16 inches long, according to one witness, and 26 to 30 inches long, according to another. It was Summerlin's duty to return to Harper, the foreman of the switching crew, after setting the brakes of his first cut of cars; but he did not do so. Harper lined the switch for the second cut of cars, and thought nothing of Summerlin's absence. He testified that it was not unusual for a switchman to take 15 or 20 minutes to set up two or three brakes. As Summerlin did not appear for over 20 minutes, Harper and the engineer went to look for him, as was customary. They found him dead under one of the cars, about in the middle of the then cut of seven. He

was lying on his stomach, his head outside of the rails, and his body between them, and the wheels of one or more of the cars had passed over his chest. The evidence negatives any motive for suicide on the part of the deceased.

The foregoing facts are practically without dispute. The evidence is conflicting as to where Summerlin's hat and lantern were found, although they were in close proximity to his body, as to whether he was dragged along the track, and as to whether his gloves were on his hands or not, but this is comparatively unimportant. It is contended by defendant that negligence of defendant has not been shown, and that it is impossible to say what Summerlin was doing at the time of his death.

Negligence vel non is usually a question for the jury under all the facts and circumstances of the case. On the facts above shown it is certain Summerlin was going about his duty when he mounted the first car of the cut of five. As this cut moved when the next two cars were coupled to it, it is reasonable to suppose that sufficient brakes had not been set to hold it. It is clearly to be inferred from Harper's testimony that it was Summerlin's duty to set more than one brake, and to do this might take 15 to 20 minutes. It would also be reasonable to suppose that for 5 or 6 minutes Summerlin was engaged in setting brakes, and had not turned aside from his duty for his own purposes. It was within that space of time that two other cars were put in on track 5 at what was admittedly an unsafe speed.

We think the evidence, although circumstantial, with the inferences that reasonable men would naturally draw from it, supports the finding that Summerlin was engaged in setting a brake on one of the five cars when the coupling was made; that the unsafe speed of the engine and two cars in making the coupling caused an impact of unnecessary and unexpected violence, and threw Summerlin off the narrow platform on which he had to stand, with the result that he was killed. This presented a question of negligence, sufficient to go to the jury, and it was not error to refuse to direct a verdict for defendant.

Affirmed.